UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DANNY MCDOLE,

        Plaintiff,

                                      Case Number 07-13697-BC
v.                                     Honorable Thomas L. Ludington

CITY OF SAGINAW,

        Defendant.
_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DISMISSING COUNT II OF PLAINTIFF'S COMPLAINT WITH PREJUDICE, AND GRANTING PLAINTIFF'S MOTION TO SUPPLEMENT HIS RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On August 31, 2007, Plaintiff Danny McDole filed suit against his former employer, Defendant City of Saginaw. He advances claims of employment discrimination based on race, in violation of Title VII of the Civil Rights Act of 1964, as amended (Title VII), 42 U.S.C. § 2000e *et seq.*, and the Michigan Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 *et seq.*, as well as a claim of employment discrimination based on disability, in violation of the Persons with Disabilities Civil Rights Act (PWDCRA), Mich. Comp. Laws § 37.1101 *et seq*. On May 23, 2008, Defendant filed a motion for summary judgment under Federal Rule of Civil Procedure 56.

The Court has reviewed the parties' submissions and finds that the facts and the law have been sufficiently set forth in the motion papers. The Court concludes that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. *Compare* E.D. Mich. LR 7.1(e)(2).

I.

On February 10, 2006, Defendant ended Plaintiff Danny McDole's employment as a police

officer after an internal investigation of an incident. The investigation revealed some differences in versions of the events that occurred on October 14, 2005. Notwithstanding certain disputes regarding particulars, that circumstance generally involved Plaintiff's response to racial epithets and reckless driving targeted at his vehicle, as well as his subsequent participation in arresting and, allegedly, injuring one of the people in the other vehicle. Plaintiff, who is African-American, however, maintains that Sergeant Anjanette Tuer, who conducted the internal investigation, repeatedly demonstrated a racial bias against him.

According to a police report completed by Plaintiff on October 15, 2005, persons in a sport utility vehicle ("SUV") shouted racial epithets at him and threw two bottles at Plaintiff's vehicle as he drove to work. The SUV kept pace with Plaintiff's vehicle, slowing down and speeding up with it. In the police report, Plaintiff stated that he observed one apparently intoxicated passenger hanging out a window. When Plaintiff turned on his dome light so as to reveal his police uniform to them, the situation only escalated. When the SUV cut him off, Plaintiff exited his vehicle with his weapon drawn, and he identified himself as a police officer. Those inside the vehicle expressed concern that Plaintiff was a police officer and shouted requests that he not shoot them. The SUV then sped off. Plaintiff got the SUV's license plate number. Shortly thereafter, Plaintiff stated in his report that the SUV returned and followed his vehicle closely. Subsequently, Plaintiff and other officers located the driver and took him to jail. The criminal charges against the driver and a passenger were later dismissed.

In response to a letter from the criminal defense attorney representing one person in the SUV and a letter from Saginaw County's prosecuting attorney, an investigation commenced into the incident. Sergeant Allan Ogg of the Michigan State Police and Sergeant Tuer of Defendant's police

department conducted the investigation and the relevant interviews. Tuer interviewed some witnesses, Ogg interviewed others, and both Tuer and Ogg interviewed still other witnesses. Ogg's criminal investigation proceeded jointly with Tuer's administrative investigation, according to Tuer and Defendant's police chief, Gerald Cliff.

According to witnesses and as revealed during the internal investigation, Alejandro Ornelas drove the SUV, Ty Burris was the front passenger, and Michael Canda was a passenger in the rear of the vehicle. The SUV tapped on its brakes when another vehicle was following closely, and Burris threw a water bottle out the window. The driver of the other vehicle, a police officer, swore at them and demanded that they pull over, as he pointed a gun at them. The officer threatened to kill them and appeared to get their license plate number. Later in the evening, that officer, along with other officers, arrived at the same bar where Ornelas and Burris were. Burris exited the premises from the rear, but Plaintiff handcuffed Ornelas and walked him to the police car. More than one witness reported seeing Plaintiff punch Ornelas in the face and close the door on Ornelas' legs. No witness indicated that Ornelas resisted in any way. At the jail, the nurse observed that he had a chipped tooth and cut lip. At least one officer observed Plaintiff come to the booking area, review Ornelas' booking sheet, and, at a minimum, attempt to get Ornelas' attention, if not threaten him. Plaintiff disputes some of aspects of the foregoing description, but this recitation summarizes the facts as presented in Tuer's report on the incident.

Additionally, the report also noted that Burris maintains that he subsequently received threatening phone calls. Burris retained recordings of those messages. In his deposition, Plaintiff acknowledged that he left some of those messages, some of which recorded simply his breathing.

The investigation concluded that Plaintiff provided several inconsistent statements. Some

-3-

of these involved which vehicle caused the other vehicle to stop, who left the scene first, the proximity of Plaintiff's gun to Burris, and how many bottles hit Plaintiff's vehicle. Certain witnesses also contradicted Plaintiff's assertions that he did not go into the bar to detain Ornelas, that he had no further contact with Ornelas after placing him in the squad car, and that he did not strike Ornelas. Plaintiff did admit that he intended to intimidate Ornelas by visiting him at that jail and that he made four inappropriate phone calls to Burris. Tuer's report concluded that Plaintiff had violated several general orders of the police department, including his obligation to be truthful to his superiors, to treat persons in custody appropriately, and not to use more than reasonable force.

On December 19, 2005, Defendant's officer of employee services referred Plaintiff to an employee assistance program ("EAP"). According to Plaintiff's deposition, Tuer directed him to make those arrangements because he was an "angry black male." When he hesitated, Tuer contacted the EAP program. The then-program coordinator of the EAP program found this referral somewhat out of the ordinary, because, in her assessment, Plaintiff's circumstance was not as dramatic as others who had been sent for psychological evaluations. During this time, Plaintiff was placed on administrative leave.

On January 3 and 6, 2006, a psychologist evaluated him and concluded that he met the criteria for post-traumatic stress disorder, mild severity.[1] Plaintiff described sleeplessness and

---

[1]On July 23, 2008, after the parties received notice of the cancellation of the hearing on Defendant's motion for summary judgment, Plaintiff filed a motion for leave to supplement his response. More specifically, he sought leave to file the psychologist's report, which both parties reference in their filings. It appears that the parties intended to file the report as an exhibit, but under seal pursuant to a protective order. Because no protective order ever entered, Plaintiff filed a motion for leave to file the report. As the parties both incorporate information from that report and as Plaintiff himself has elected to file the report as an exhibit to his motion (rather than seek to preserve any privacy interest that he may have), the Court will grant his motion.

nightmares related to the incident. The psychologist recommended that Plaintiff continue with therapy with a specialist in the area of trauma recovery and stated that Plaintiff had a good prognosis for recovery. This good prognosis made him likely to be fit to return to duty after a brief course of therapy. Without that therapy, the psychologist allowed for the possibility that his judgment would be impaired and that he would continue to experience disturbances to his sleep. According to the EAP program coordinator, post-traumatic stress can affect decision-making abilities. She believed that Plaintiff should not have participated in arresting one of the people involved in the incident.

In his deposition, Plaintiff acknowledged that the single session with the psychologist is the only medical evaluation or treatment he has ever received for this diagnosis, which no other health care provider had previously identified. In an affidavit, Plaintiff states that he continues to lose two to three hours of sleep a night.

According to the police chief's deposition, he, the deputy chief, the city attorney, and the personnel director met after the conclusion of both investigations.[2] The personnel director is also Defendant's labor relations administrator. The police chief described the decision to end Plaintiff's employment as the "result" of that conference with those five people, and the personnel director made the final recommendation to the city manager. Despite Plaintiff's attempt to construe Tuer's deposition otherwise, Tuer describes her role as participating in a discussion and presenting the findings of her report, but not making any recommendations. According to the deputy chief, he provided input on the extent of punishment, and he suggested a "severe suspension" of not less than

---

[2]Defendant's police chief could not pinpoint the date and expressed uncertainty about whether the state police's criminal investigation had concluded. Still, he expressed certainty that the criminal investigation would likely have concluded before Defendant determined how to resolve its own administrative investigation.

ten days. The police chief maintained that he did not know of Plaintiff's diagnosis of post-traumatic stress disorder at the time of the decision to end Plaintiff's employment, but the police chief allowed that the personnel director would have had that information. The EAP program coordinator stated that she discussed those results with the personnel director, and that occurred before Defendant ended Plaintiff's employment.

According to the city manager, he reviews recommendations regarding personnel actions for procedural compliance. Generally, if the city attorney and the personnel director agree and if the action conforms to the collective bargaining agreement (as assessed by the personnel director), then the city manager acts according to the recommendation. The city manager did not specifically recall a conversation with the police chief about the situation, although he had some recollection of a conversation with Plaintiff, who allegedly sought to express some contrition. The city manager did not recall any reference to a purported racial bias by Tuer during his conversation with Plaintiff. The city manager also did not recall if that meeting occurred before or after the termination of Plaintiff's employment. On February 10, 2006, Defendant ended Plaintiff's employment, based on the findings of the internal investigation.

On February 7, 2007, an arbitrator affirmed Defendant's decision to end Plaintiff's employment in the face of his grievance. In his decision, the arbitrator does not refer to any alleged racial bias by Tuer in his decision.

In the instant complaint, however, Plaintiff maintains that Tuer acted against him based on a racially discriminatory animus. In his deposition, he describes several racially charged comments that Tuer allegedly made. He recites that Tuer observed, apparently in the context of working on a prostitution sting operation, that only African-American men approached her and that no

Caucasians did. Also, he notes a time that she allegedly demanded that his "black ass" contribute to a fund for a Christmas party that she organized but that he did not attend. Plaintiff additionally describes a situation in which Tuer told him how a book, selected by Oprah's Book Club, about a black slave, who appeared white, had touched her. Tuer then allegedly expressed her view that, just as in that book, a white person would always be in authority over a black person and that, despite Plaintiff's potential, he would never advance in the police department. According to Plaintiff, Tuer stated that an African-American could not advance in the police department, in light of prior scandals in the department involving African-American leadership. At another time, Plaintiff alleges that Tuer reiterated the view that he would not advance because of his race and her belief that members of his race cannot and will not advance to positions of authority.

On another occasion, Plaintiff maintained that Tuer told him that she preferred to have television cameras capture an African-American officer making a particular arrest, despite the fact that that arrestee was quickly released without citation. Plaintiff also recounts a situation in which Tuer allegedly directed a suspect to "shut [his] black ass up" and purportedly indicated that a particular suspect felt his own importance based on his association with a white woman. She allegedly expressed the view that the only white women available to date black men are overweight and described such individuals as "trash." Plaintiff further asserts that Tuer once expressed that she would never date a black man.

At another time, while off-duty, Plaintiff and Tuer and two others allegedly attended a sporting event, at which Tuer purportedly observed that Plaintiff should "watch his back" because no other African-Americans were in attendance. According to Plaintiff, Tuer, who was allegedly intoxicated, told him that he would witness "white power" on Monday morning. The following

week, Plaintiff describes, three internal investigations pending against him had been deleted. In another circumstance, during roll call, Tuer allegedly asked why Plaintiff was not sitting with "his people," which she clarified meant black people.

In his deposition, Plaintiff maintains that he complained to his superiors about some of Tuer's conduct and remarks. According to him, they made clear their disinterest in his complaints and even stated in his evaluations that he complained that others were "out to get him."

Plaintiff filed suit against Defendant, alleging employment discrimination against him based on race, in violation of Title VII and ELCRA, and employment discrimination based on disability, in violation of the PWDCRA. Defendant now seeks summary judgment on these claims.

## II.

Under Federal Rule of Civil Procedure 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002). The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care*

*Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).

III.

A.

Regarding Plaintiff's claims of employment discrimination based on race, the parties do not distinguish Title VII jurisprudence from the law governing ELCRA. Consequently, the Court will address its analysis to federal law.

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 153 (2000); *see also Wright v. Murray Guard, Inc.*, 455 F.3d 702, 713 (6th Cir. 2006). An employment discrimination claim based on race under Title VII requires either direct evidence or circumstantial evidence that would support an inference of discriminatory treatment. *Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 906 (6th Cir. 2002) (citation omitted). Where an employment discrimination case is not based on circumstantial evidence, the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is not implicated. *See id*.

Here, Plaintiff has identified numerous racially charged comments by Tuer, as well as conduct that she linked to "white power." On more than one occasion, she purportedly made a derogatory remark to Plaintiff about his race. Plaintiff claims that she once indicated that he should sit with "his people" at a police department meeting. She also allegedly expressed her view that he, and other African-Americans, could not advance in the police department because of their race and because of her belief that non-African-Americans would always remain in authority over them. Plaintiff also maintains that, in an off-duty circumstance, Tuer once indicated that she would exert

"white power." Shortly thereafter, certain internal investigations against him were dismissed, and Tuer was the assigned investigator for those reviews. These incidents support an inference that Tuer may have acted toward Plaintiff with a discriminatory intent.

Whether Tuer participated in the decision to end his employment, however, informs on whether her conduct can be imputed to Defendant. Under Title VII, the discriminatory conduct of co-workers does not necessarily afford an employee a cause of action against his employer. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (stating that Title VII does not operate as a "civility code").

Yet, the fact that an employee, who has allegedly engaged in employment discrimination, does not hold an upper management position does not guarantee an employer protection from suit. "'Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [can not] suffice to satisfy the plaintiff's burden . . .' of demonstrating animus." *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)). Thus, in *Bush*, the discriminatory statements of employees who had no involvement in the decision to end that plaintiff's employment could not support his claim of race discrimination. *Id.* Similarly, the statements of intermediate officials do not give evidence of discrimination, if higher level officials make the ultimate discharge decision. *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161 (6th Cir. 1990).

Yet if an employee's discriminatory animus can be imputed to a decisionmaker, then that employee's conduct can show that racial animus caused the termination of employment. *See Noble v. Brinker Int'l Inc.*, 391 F.3d 715, 723 (6th Cir. 2004) (citations omitted). "[A] plaintiff must submit competent evidence that one employee's 'discriminatory motives somehow influenced' the

decisionmaker." *Id.* (citation omitted). In *Noble*, the court did not impute an employee's conduct to the employer. There, the court concluded that the decisionmaker had only minimal contact with the allegedly racially discriminating employee and that they had not discussed the employee in question, let alone the termination of that employee. *Id.* In *Wells v. New Cherokee Corp.*, 58 F.3d 223, 237-238 (6th Cir. 1995), however, the court did not disturb a jury's verdict, where the evidence showed that the employee who made a discriminatory remark participated in the termination decision and that the decisionmaker agreed he made decisions jointly with this other employee. In *Wilson v. Stroh's Co.*, 952 F.2d 942, 946 (6th Cir. 1992), the court concluded that an employee's comments could not be imputed to his employer. The decisionmaker conducted an independent investigation, and no evidence showed that the decisionmaker relied on the employee's recommendation.

Here, the extent of Tuer's participation in the decision to end Plaintiff's employment remains ambiguous. In her deposition, she maintains that she provided no recommendation about a response to Plaintiff's involvement in the incident of October 14, 2005. She does acknowledge that she authored the internal investigation report. Defendant's police chief suggests, however, a more consensus-based approach. He describes that the decision to end Plaintiff's employment followed as a "result" of a meeting of five individuals, which included Tuer. Further, the report concludes that Plaintiff violated three specific subsections of police department general orders; the notice of the termination of Plaintiff's employment cites to these same three subsections as the basis for the discharge. In Defendant's city manager's deposition, he describes how he did no independent investigation into the recommendations on personnel actions that he received, so long as the police chief and personnel director had conferred and agreed. Nothing in the evidence suggests that anyone

in the decisional hierarchy relied on any other information than that provided in Tuer's report from her internal affairs investigation.

Drawing all reasonable inferences in favor of Plaintiff, issues of fact remain regarding the extent of Tuer's involvement in the decision to end his employment. Although a jury may find in Defendant's favor, the dispute is not so one-sided as to entitle Defendant to judgment as a matter of law. Tuer's report provided the sole factual basis for terminating Plaintiff, and she participated in the conversation, and possibly contributed to the consensus, that resulted in that decision. Accordingly, the Court will deny in part Defendant's motion for summary judgment as to Plaintiff's Title VII and ELCRA claims.

B.

Regarding Plaintiff's claim under the PWDCRA, Mich. Comp. Laws § 37.1102(b) bars employment discrimination based on disability. More specifically, Mich. Comp. Laws § 37.1202(1)(b) bars employers from "[d]ischarg[ing] or otherwise discriminat[ing] against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability . . . that is unrelated to the individual's ability to perform the duties of a particular job or position."

As defined in Mich. Comp. Laws § 37.1103(d), in relevant part, "disability" means one or more of the following:

> (i) A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic:
> (A) . . . substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion.

* * *
      (ii) A history of a determinable physical or mental characteristic described in subparagraph (i).
      (iii) Being regarded as having a determinable physical or mental characteristic described in subparagraph (i).

To prove a *prima facie* case under the PWDCRA, "the plaintiff must show (1) that he [has a disability] as defined in the act, (2) that the [disability] is unrelated to his ability to perform his job duties, and (3) that he has been discriminated against in one of the ways delineated in the statute." *Chiemelewski v. Xermac, Inc.*, 580 N.W.2d 817, 821 (Mich. 1998) (citation omitted); *Peden v. City of Detroit Police Dep't*, 680 N.W.2d 857, 862 (Mich. 2004). Then the burden shifts to the defendant to respond with a legitimate, non-discriminatory reason for its employment decision. *Kerns v. Dura Mechanical Components, Inc. (On Remand)*, 618 N.W.2d 56, 62 (Mich. Ct. App. 2000). The plaintiff then has the opportunity to rebut this reason as mere pretext. *Dubey v. Stroh Brewery Co.*, 462 N.W.2d 758, 759 (Mich. Ct. App. 1990).

In assessing whether a plaintiff has a disability, the nature and severity of the impairment determines whether it "substantially affects" a major life activity. *Lown v. J.J. Eaton Place*, 598 N.W.2d 633, 638 (Mich. Ct. App. 1999). "It is not enough that an impairment affect a major life activity; the plaintiff must proffer evidence from which a reasonable inference can be drawn that such activity is substantially or materially limiting." *Id*. (citation and internal quotations omitted).

Here, Defendant asserts and Plaintiff does not dispute that Michigan law does not currently treat sleeping as a major life activity. Yet the statute does not enumerate specific activities, and the *Lown* court was willing to consider whether lifting might, under certain circumstances, qualify as a major life activity. Despite Defendant's arguments based on the psychologist's positive prognosis for Plaintiff, with treatment, and Plaintiff's election not to seek further treatment, Plaintiff's affidavit

that his sleep is disrupted for two to three hours each night suffices to support a conclusion of disability. If lifting can be included as a major life activity, the Court sees little reason to exclude a regular night's sleep from those deemed major life activities. Granting all inferences in Plaintiff's favor at this juncture, the Court cannot conclude that Plaintiff has no disability.

Regarding whether Plaintiff's condition was unrelated to his ability to perform his job, the parties offer competing evidence. Defendant cites to the psychologist's evaluation, which suggests that Plaintiff "is likely to be fit to return to work" with continued therapy. Plaintiff acknowledges that he has not sought this additional therapy, but he submits an affidavit attesting that he was ready and able to return to work as of the date of that his employment ended. Although a jury might find the psychologist's assessment more persuasive, Plaintiff has created a genuine issue of material fact as to whether any sleep disruption and/or post-traumatic stress condition is unrelated to his ability to perform his job.

Assuming that Plaintiff has demonstrated a *prima facie* case of employment discrimination based on disability, Defendant has articulated a legitimate, non-discriminatory reason for ending his employment. Setting aside Plaintiff's disputes with particular factual findings in the internal affairs investigation, his own version of events lends support to Defendant's decision. He acknowledges that he approached a vehicle with his weapon drawn, visited an arrestee in jail so as to intimidate him, and left harassing messages for another arrestee, which Plaintiff agrees were inappropriate. The volatility with which Plaintiff responded to this circumstance, coupled with the prosecuting attorney's recommendation of an investigation into possible criminal charges against him, provide a legitimate, non-discriminatory basis for ending Plaintiff's employment. Additionally, the soundness of an employer's business judgement is not subject to challenge. *See Dubey*, 462 N.W.2d

at 760.

As to pretext, a plaintiff has "three ways [to] establish that a defendant's stated legitimate, nondiscriminatory reasons are pretexts: (1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision." *Id*. (citation omitted). Here, Plaintiff's own admissions and report of the incident demonstrates that Defendant's legitimate, non-discriminatory reasons do have a basis in fact, even though he continues to dispute some of the particulars of the events.

Additionally, Plaintiff has not shown that his conduct during those events was not the actual basis for the decision to end his employment. Instead, he simply adverts to that possibility. That is, he suggests that, because Tuer authored the report that provided the basis for the city manager to authorize the end of his employment, some other factors motivated Defendant's decision. Even if true, this argument would support a race discrimination claim; it does not show that a pretext existed for ending his employment due to discrimination based on any disability.

Finally, Plaintiff has not even argued that the October 14, 2005 incident would not justify his termination. Rather, he argues that particular factual disputes, such as whether or not he struck Ornelas, result in a defect in the basis of Defendant's decision. Again, questioning the "soundness of an employer's business judgment" does not provide a basis for demonstrating a pretext. *Dubey*, 462 N.W.2d at 760. Although Tuer's report is intertwined with Defendant's decision to end Plaintiff's employment, he has provided no basis for imputing a bias based on disability to her or, by extension if permissible under law, through to Defendant's decisionmakers. More importantly, Plaintiff has not demonstrated a pretext in any one of the three manners permitted under Michigan

law.

Consequently, the Court will grant Defendant's motion as to the PWDCRA claim. Plaintiff has not shown that Defendant's legitimate, non-discriminatory reason for ending the employment of an officer who was untruthful to his superiors and inappropriately treated a person in custody was a pretext for discrimination based on disability.

IV.

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment [dkt #13] is **GRANTED IN PART** and **DENIED IN PART**. Count II of Plaintiff's complaint, a claim of a violation of the PWDCRA, is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that Plaintiff's motion to supplement his response to Defendant's motion for summary judgment [dkt #21] is **GRANTED**. The psychologist's evaluation of Plaintiff, authored by Frances Erwin in January 2006 and attached as Exhibit A to Plaintiff's motion to supplement [dkt #21-2], is deemed filed.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: July 25, 2008

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 25, 2008.

s/Tracy A. Jacobs
TRACY A. JACOBS