UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DANNY MCDOLE,

        Plaintiff,

                                      Case Number 07-13697-BC
v.                                          Honorable Thomas L. Ludington

CITY OF SAGINAW,

        Defendant.
_____/

## ORDER DENYING DEFENDANT'S MOTION FOR NEW TRIAL

Commencing on February 17, 2009, the Court held a jury trial on Plaintiff Danny McDole's race discrimination claims against Defendant City of Saginaw arising from the termination of his employment. Plaintiff's claims were brought for violations of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e et seq., and the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101 et seq. Defendant explained that Plaintiff's employment was terminated by five senior decisionmakers after consideration of an internal affairs investigation of Plaintiff's involvement in an October 14, 2005, incident. The senior managers met in early February 2006, resulting in a February 10, 2006 notice of violation of rules discharging Plaintiff from his employment. The managers considered the internal affairs report concerning the October 14, 2005, incident authored by Sergeant Tuer and completed on or about January 10, 2006. Plaintiff disputed Defendant's reliance on the October 14, 2005, incident as the basis for termination of his employment. Plaintiff argued that Defendant's reliance on the October 14, 2005, incident was a pretext for their discriminatory decision to terminate his employment based on his race.

On March 3, 2009, a jury returned a verdict in favor of Plaintiff, concluding that Plaintiff was entitled to $950,000 in economic damages and $50,000 in non-economic damages. Now before the

Court is Defendant's motion for a new trial [Dkt. # 83], filed on July 8, 2009. Plaintiff filed a response [Dkt. # 90] on August 20, 2009; and Defendant filed a reply [Dkt. # 91] on August 26, 2009. The Court held a hearing on the motion on September 24, 2009. For the reasons stated below, Defendant's motion will be denied.

I

A district court may order a new jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Generally, Rule 59 provides district court judges with "broad discretion." *In re Saffady*, 524 F.3d 799, 808 (6th Cir. 2008). A new trial is appropriate when the jury reached "a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Holmes v. City of Massillon*, 78 F.3d 1041, 1045-46 (6th Cir. 1996) (citing *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940), *Cygnar v. City of Chicago*, 865 F.2d 827, 835 (7th Cir. 1989), and *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir. 1983)). Ultimately, "[t]he governing principle in the Court's acting on a motion for new trial is whether, *in the judgment of the trial judge*, such course is required in order to prevent an injustice; and where an injustice will otherwise result, the trial judge has the duty as well as the power to order a new trial." *Saffady*, 524 F.3d at 808 (quoting *Davis by Davis v. Jellico Cmty Hosp. Inc.*, 912 F.2d 129, 133 (6th Cir. 1990), and adding emphasis).

II

In its motion for a new trial, Defendant advances four principal arguments, including: (1) the Court erred when it admitted evidence of Plaintiff's Employee Assistance Program ("EAP")

evaluation and diagnosis of post traumatic stress disorder ("PTSD"); (2) the Court erred when it admitted evidence of allegedly disparate treatment; (3) the Court's disparate treatment instruction defined "similarly situated" too broadly and allowed the jury to compare Plaintiff to persons with whom he was not similarly situated; and (4) the Court erred when it did not instruct the jury regarding the "honest belief" rule. Defendant has not argued that the verdict is against the weight of the evidence or that the damages are excessive. *See Holmes*, 78 F.3d at 1045-46. Rather, Defendant argues that prejudice resulted from the admission of specific pieces of evidence and instructions used to guide the jury. Each argument will be addressed below.

A

Defendant contends that evidence of Plaintiff's EAP evaluation, which was required by Defendant following the October 14, 2005, incident, and Plaintiff's diagnosis of PTSD, should have been excluded from trial because they were not relevant. *See* Fed. R. Evid. 401, 402. Defendant also contends that even if relevant, any probative value of the evidence was substantially outweighed by the danger of unfair prejudice. *See* Fed. R. Evid. 403. More specifically, Defendant contends that Plaintiff never presented any evidence to establish that Defendant had ever considered an employee's medical or mental health condition when making an employment decision. That is, Plaintiff presented no evidence that he was treated differently than an employee of another race. Finally, Defendant contends that the jury instruction regarding an employee's medical condition was not sufficient to overcome the prejudice resulting from admission of the evidence because the jury was invited to evaluate the "fairness" of Defendants decision to terminate Plaintiff's employment.

1

Defendant objects to the following evidence that was admitted at trial: Plaintiff's December

2005 treatment records from Child & Family Services, Defendant's contract EAP provider, Pl. Trial. Ex. 105; the psychological evaluation performed by Dr. Mark Zaroff on January 3 and 6, 2006, Pl. Trial Ex. 106; the trial deposition of Christine Brennan, the EAP evaluator; and the trial deposition of Dr. Zaroff. In its motion, Defendant summarizes the evidence as follows:

> The Zaroff report includes Plaintiff's version of the "road rage" incident, including that Plaintiff "reported he felt his life was in danger, and felt overwhelmed and threatened." The report also describes Plaintiff's "sketchy memory" of leaving messages on Ty Burris' telephone. The report explains that Plaintiff "was feeling afraid, confused, and embarrassed." The report describes other, prior work-related incidents, including a murder and car fire, which made Plaintiff "feel out of control." The report stated that Plaintiff was having nightmares since the October incident as well as "recurrent and intrusive recollections of the event." Dr. Zaroff concluded his report by stating that Plaintiff meets the criteria for PTSD, mild severity. Dr. Zaroff testified at trial, via deposition, that the road rage event was the likely trigger for the PTSD. Dr. Zaroff also testified that it was possible that Plaintiff's actions following the incident were influenced by PTSD. Dr. Zaroff testified that Plaintiff needed clinical attention after the incident and that his symptoms could have affected his performance as a police officer.
>
> The EAP treatment records prepared by Christine Brennan at Child & Family Services, dated December 19, 2005, stated that Plaintiff "presents with some PTSD signs and symptoms due to an altercation (racial) on his way to work." Ms. Brennan also testified, via deposition, to her diagnosis of PTSD as a result of the incident during which Plaintiff claimed he was assaulted on his way to work. Ms. Brennan testified that PTSD can affect decisionmaking at the time of the trauma. Ms. Brennan also testified to a causal relationship between Plaintiff's misconduct and Defendant's

decision to send Plaintiff to assist with the arrest of the road rage suspects. Ms. Brennan testified that Plaintiff was retraumatized when he was sent out to arrest or find the suspects and that in her opinion, "that should have never happened . . . he should have never been part of it." When asked whether a decisionmaker could have possibly evaluated Plaintiff's behavior without considering the PTSD, Ms. Brennan responded, "Well, with [PTSD], if you're retraumatized or part of that trauma again, you know, you don't make really good decisions." She further explained:

> I think it would be hard not to place the behavior along with the trauma. He was traumatized and then was asked to be part of arresting these people or finding these people. Again, I am going to say that he probably should have never been part of that. And if after that is where his behaviors came from, when we're frightened we don't always make the best decisions. You know, when we're afraid or something else is really stressing us or retriggering that anxiety, then we don't always make the best decisions.

Defendant also emphasizes that Plaintiff's counsel stated during closing argument, "[H]ow can you analyze Danny's conduct without the full picture, without the diagnosis of [PTSD]? You can't. And Tuer knew that." Tr. 135 (Mar. 3, 2009). Defendant contends that Plaintiff asserted at trial that Defendant aggravated or even caused the PTSD and resulting conduct. For example, over Defendant's objection, the Court allowed Plaintiff to testify that his conduct in making the phone calls to Ty Burris was outside his normal character. Tr. 98-99 (Feb. 23, 2009). During discussion regarding Defendant's objection to such testimony, Plaintiff's counsel acknowledged that "the point of the question is he's undergoing significant stress and the doctors have diagnosed him with [PTSD]." *Id.* 98. Finally, Defendant emphasizes that it objected to Plaintiff's proposed voir dire, which included a question regarding PTSD. *See* [Dkt. # 43]. On the first day of trial, the Court advised the parties that it was overruling Defendant's objection and allowing the question regarding PTSD. Tr. 2-5 (Feb. 18, 2009).

2

On July 5, 2008, the Court entered an order [Dkt. # 22] granting in part and denying in part Defendant's motion for summary judgment. At that juncture, the deposition testimony of Police Chief Gerald Cliff suggested that the decision to terminate Plaintiff's employment was the result of a consensus of five City of Saginaw managers, including Sergeant Tuer. In some contrast, Sergeant Tuer testified in deposition that she had no role in the decision to terminate Plaintiff's employment and only presented her internal investigation report.

On the basis of this information, the Court found that there was a genuine issue of material fact regarding the extent of Sergeant Tuer's involvement in the decision to terminate Plaintiff's employment. The factual dispute was material because Plaintiff alleged racial bias against Sergeant Tuer, including that she was responsible for referring him to the EAP because he was an "angry black man."

On December 3, 2008, the Court tentatively granted Defendant's motion in limine, in which Defendant argued that evidence of Plaintiff's EAP evaluation and PTSD diagnosis should be excluded because it was not relevant and would be prejudicial. Notably, Defendant conceded that evidence that supported Plaintiff's allegation that Defendant required Plaintiff to undergo the evaluation because he was an "angry black man" was relevant to the decision to send Plaintiff to the EAP but not to the decision to terminate Plaintiff's employment. The Court explained as follows:

> At this point, Plaintiff has not shown that either the evaluation or diagnosis of PTSD is relevant beyond the allegation that Defendant required Plaintiff to undergo the evaluation because he was "an angry black man." Accordingly, to the extent that Plaintiff does not show that either piece of evidence is probative of race discrimination at trial, the evidence will be excluded under Federal Rule of Evidence 402.

[Dkt. # 33, p.7]. That is, Plaintiff's testimony connected Sergeant Tuer's alleged decision to seek

the EAP evaluation with her alleged racial remarks, but it remained unclear how the report was relevant to the decision to terminate Plaintiff's employment.

> Later, in a joint final pretrial order, Plaintiff stated the following:
>
> Sergeant Tuer is adamant that she did not participate in the decision to terminate and asserts that Chief Cliff is a liar if he suggested otherwise. Chief Cliff claims that there was a consensus reached by everyone, including Sergeant Tuer and Deputy Chief Martin that termination was to occur. Deputy Chief Martin also denies recommending termination despite the fact that Chief Cliff claims he recommended termination as well.

At trial, before opening statements, defense counsel inquired as to the status of the Court's decision on its motion in limine and reiterated its objection to evidence regarding the EAP and PTSD. The Court recognized Defendant's objection, but, after review of the pretrial statement, indicated that Plaintiff would be allowed to present evidence regarding the EAP evaluation and PTSD, explaining:

> The Court is satisfied that based on the connection between the initial references, according to the plan, to race at the inception of the direction to the EAP, and the fact that results of the EAP were shared with the decisionmakers [i.e. Sergeant Tuer, at a minimum] is enough to get it within the realm of basic relevance.

Tr. 2-6. At that point, it was apparent that the participants in the meeting where it was decided that Plaintiff's employment would be terminated were Police Chief Cliff, Deputy Chief Martin, Ralph Carter, Sergeant Tuer, and city attorneys Tom Fancher and Michelle Allen.

At the conclusion of the trial, the Court instructed the jury as follows:

> (1) An employer may terminate an employee for misconduct even if the conduct is a manifestation of an employee's medical condition.
>
> (2) However, if you find that it was the ordinary procedure of the defendant to consider such information when making employment decisions, evidence that the plaintiff was treated differently may support an inference of discrimination to the extent that the difference in treatment can reasonably be attributed to race.

*See* [Dkt. # 67].

3

Based on the above, Defendant contends that Plaintiff never presented any evidence to establish that Defendant had ever considered an employee's medical condition when making an employment decision. In other words, there was no evidence that Plaintiff was treated differently than an employee of another race. Defendant contends that the evidence invited the jury to make its decision based on an impermissible emotional basis and suggested to the jury that Defendant was actually responsible, at least in part, for Plaintiff's misconduct, by sending him to assist in the arrest of Alex Ornelas. Defendant contends that the instruction regarding an employee's medical condition was not sufficient to overcome the prejudice resulting from admission of the evidence because it invited the jury to evaluate the "fairness" of Defendant's decision, rather than focus on whether the decision was motivated by Plaintiff's race.

Plaintiff emphasizes a number of facts in response, directed toward Defendant's credibility in its asserted defense of its decision to terminate Plaintiff's employment and not its disparate impact on Plaintiff as an African-American. First, the internal affairs investigation of the October 14, 2005, incident was commenced by Sergeant Tuer following a request from the prosecuting attorney that an outside agency investigate the allegations made against Plaintiff. The request was made in mid-November 2005 and the investigation was completed with a report on or about January 10, 2006. Between those dates Plaintiff was ordered to attend a mandatory EAP session with Ms. Brennan on December 19, 2005, to address the events of the October 14, 2005, incident, as well as a multi-session psychological evaluation by Dr. Zaroff. While it remained unclear to the Court during trial whether Sergeant Tuer requested the EAP evaluation or considered the results in preparing the

internal report, it was clear that Ralph Carter, Defendant's Labor Relations Administrator, did. Moreover, Ms. Brennan later met personally with Mr. Carter, and discussed her findings of PTSD and its possible influence on Plaintiff's conduct on October 14, 2005. As a result of that conversation, Carter directed that Plaintiff undergo a relatively expensive mandatory psychological evaluation with Dr. Zaroff that was completed in mid-January 2006. Dr. Zaroff's report concluded that Plaintiff's prognosis was very good and that he was fit to return to duty with a brief course of therapy.

As previously indicated, Sergeant Tuer disputed knowing about either the EAP referral or the psychological evaluation. Mr. Carter did not dispute receiving either report, but he also testified that he did not share the reports or any of the related information when he met with the decisionmakers several weeks later and terminated Plaintiff's employment. Plaintiff argued that Mr. Carter's testimony was not believable and the fact that it was concealed from the decisionmakers was evidence that the reasons for Plaintiff's termination was something other than his October 14, 2005, conduct. In fact, Chief Cliff testified that the disclosure of the EAP evaluation, the diagnosis of PTSD, and the psychological evaluation could have had an impact on the managers' decision to terminate Plaintiff's employment. Tr. 66-71.

Plaintiff also contends that the jury instruction read by the Court, as quoted above, properly instructed the jury as to the manner in which they could consider the medical information. Plaintiff emphasizes that the Court further informed the jury of the extent to which it could question Defendant's decisionmaking process in the following instruction:

> Your task is to determine whether the defendant discriminated against the plaintiff. You are not to substitute your judgment for the defendant's business judgment or decide the case based upon what you would have done. However, you may consider the reasonableness or the lack of reasonableness in the defendant's stated business

>judgment, along with all the other evidence, in determining whether the defendant discriminated or did not discriminate against the plaintiff.

In reply, Defendant contends that the instructions provided by the Court were not sufficient to counteract prejudice because, the evidence was highly prejudicial and the instructions were not forceful and were given at the end of the case rather than when the evidence was admitted. Defendant also contends that there was no evidence to support the relevance of the evidence even for the limited purpose outlined in the jury instructions. Defendant contends that Chief Cliff only testified that Plaintiff's diagnosis of PTSD could have been considered by Defendant, not that it was Defendant's ordinary procedure to consider such information when making employment decisions. Tr. 66-71 (Feb. 24, 2009). Additionally, Ralph Carter testified that the EAP referral and psychological evaluation were, in his opinion, unrelated to the disciplinary decision in this case. Tr. 121-22 (Feb. 25, 2009). Finally, Defendant contends that there was no evidence that Defendant ever considered any employee's medical condition in making an employment decision, thus, there was no similarly situated employee with which to compare Plaintiff.

The introduction of evidence concerning the EAP, Plaintiff's PTSD disorder, and the psychological evaluation does not require a new trial. The Court's preliminary decision on Defendant's motion in limine did not find the order that Plaintiff submit to an EAP evaluation relevant to his race discrimination case. However, as Defendant's decisionmakers' reliance on the October 14, 2005, incident for terminating Plaintiff's employment became clearer, Mr. Carter or Sergeant Tuer's decision to withhold the EAP report and the psychological evaluation from the other decisionmakers became relevant to Plaintiff's refutation of Defendant's explanation for termination of Plaintiff's employment. Thus, based on the relevance of the evidence, and the instruction provided to the jury, Defendant's argument that admission of the evidence justifies a new trial is

rejected.

B

Next, Defendant contends that the Court should grant its motion for a new trial because the Court erred when it admitted evidence of allegedly disparate treatment of Officers Bickel and Bell by Defendant. Before trial, Defendant filed a motion in limine to exclude evidence regarding assault allegations made against Officers Bickel and Bell in a lawsuit filed against the City of Saginaw. The motion also addressed some eight other officers and incidents that Defendant believed Plaintiff might seek to introduce to demonstrate disparate treatment of Plaintiff. Defendant argued that the incidents and decisionmakers were not sufficiently similar to Plaintiff's case to be considered relevant. The Court did not rule on Defendant's motion in limine before trial because of disputes about the facts related to the incidents that were necessary to determine whether they were or were not similar to Plaintiff's case.

During trial, Defendant reiterated its objection about the Bickel and Bell incident when Plaintiff was questioned on direct examination about the incident because Plaintiff lacked personal knowledge regarding the events. Tr. 12-16 (Feb. 23, 2009). While noting that Plaintiff's counsel was "on thin ice with this witness," *id.* 16-17, because Plaintiff appeared to have little personal knowledge about the incident, the Court allowed continued questioning of Plaintiff regarding the subject because the Court also remained unfamiliar with the facts of the incident and the extent of Plaintiff's actual personal knowledge. Defendant further objected based on hearsay when Plaintiff testified that he learned about the lawsuit from Officer Bell, but the objection was overruled by the Court as the statement or admission had been related to him by responsible members of the police department. *Id.* 18. Defendant contends that, at the conclusion of Plaintiff's testimony, it was clear

that Plaintiff had no knowledge of the actual events (other than that there was a "scuffle") and was aware only of some of the allegations made in the lawsuit filed against Officers Bickel and Bell. *Id.* 19.

Defendant specifically focuses on Plaintiff's counsel method of questioning Chief Cliff about the Bickel and Bell matter, and that he provided the allegations in the lawsuit embedded in his question - "that they beat up this man that was at the Rally Burgers and ripped his rotator cuff and assaulted and battered him." Tr. 79 (Feb. 24, 2009). Defendant objected because the question assumed facts not in evidence. *Id.* 79-80. While noting that Plaintiff's counsel "is not asking any questions, he's testifying," the Court let the question stand. *Id.* 80. It remained less than clear whether the witness was unfamiliar with the queried information or more generally the incident. Chief Cliff testified to his knowledge of the lawsuit, which it was later determined was based solely on his quick review of a copy of the complaint, which Plaintiff's counsel handed to him at trial. *Id.* Plaintiff's counsel asked Chief Cliff whether he was aware that the case had been settled. *Id.* 81. Defense counsel objected without specification, and the objection was overruled for lack of understanding of its merit. *Id.* Plaintiff's counsel then inserted the amount of the alleged settlement ($80,000) into his next question. Chief Cliff denied knowledge of same. *Id.* The Court then ruled that Plaintiff could not admit the hearsay complaint into evidence. Defendant contends that this was nevertheless accomplished de facto through Plaintiff's counsel's questions and Plaintiff's own testimony.

Several points were important to the Court. First, the parties' factual assertions in their pretrial papers varied and could only be resolved by hearing the evidence and then seeking to reach a decision by applying the applicable law. Plaintiff's counsel clearly, and at times, inappropriately

sought to lead his client and Chief Cliff into confirming information introduced through his questions. However, Plaintiff's responses and Chief Cliff's responses confirmed for both the jury and the Court that neither of the two gentlemen knew much at all about the incidents. Moreover, a motion to strike the evidence was not sought once Plaintiff's proffer of the similar circumstances was concluded.

Finally, the Court also instructed the jury that the only evidence that they were to consider was the witnesses' testimony and not the attorneys' questions. The instruction was as follows:

> The evidence in this case includes only what the witnesses said while they were testifying under oath; the exhibits that I allowed into evidence; and the stipulations that the lawyers agreed to. . . . Nothing else is evidence. The lawyers' statements and arguments are not evidence. Their questions and objections are not evidence. My legal rulings are not evidence. And my comments and questions are not evidence.

C

Next, Defendant contends that the jury instruction, quoted immediately above, defined the class of similarly situated employees too broadly. Defendant contends that the following instruction, which had been proposed by Defendant, should have been given:

> The plaintiff does not have to produce direct evidence of intentional discrimination. Intentional discrimination may be inferred from the existence of other facts. For example, evidence that similarly situated employees were treated more favorably than the plaintiff for the same or similar conduct may support an inference of discrimination to the extent that the difference in treatment can reasonably be attributed to race.
>
> To be "similarly situated," the plaintiff and the employees to whom he compares himself do not have to be exactly the same, but they must be similar in all relevant aspects. What aspects are relevant depends on the facts and circumstances of this case. Generally speaking, relevant aspects include whether the plaintiff and the other employees dealt with the same decisionmakers, were subject to the same standards, and engaged in the same conduct without different or mitigating factors that would distinguish their conduct or the employer's treatment of them for it.

*See* [Dkt. # 62].

Defendant contends that the jury instruction provided at trial required only similar conduct and similar decisionmakers, thereby establishing a broader group of potential comparable employees than supported by the relevant case law. Defendant criticizes that the Court did not instruct the jury that the same, rather than similar, decisionmakers must have been involved, nor did the Court instruct the jury that the comparable employees must have been engaged in the same conduct.

Specifically, Defendant contends that the jury was allowed to rely on the Bell and Bickel incident previously discussed, as well as alleged assaults involving Officer Skabardis and Officers Schirmer and Rocha. With regard to Skabardis, Plaintiff testified that Skabardis "apparently beat up a young black kid." Tr. 12 (Feb. 23, 2009). Sergeant Tuer testified that the department did not conduct an investigation regarding the incident because Skabardis was working with a federal task force at the time, and the federal agency conducted the investigation. Tr. 68 (Mar. 3, 2009). Importantly, Sergeant Tuer further explained that she had no involvement and no knowledge of the circumstances of the alleged incident. *Id.* 89-90.

Plaintiff also testified to his "understanding" that when responding to a call on West Holland, Officers Schirmer and Rocha were fighting with someone and "ended up having to slam him pretty hard," and that he required a number of stitches. Tr. 19 (Feb. 23, 2009). Sergeant Tuer testified that she never received a complaint regarding an incident on Holland involving Officers Schirmer and Rocha. Tr. 68 (Mar. 3, 2009).

Defendant contends that the jury instruction's reference to "similar" conduct allowed the jury to improperly conclude that different treatment of police officers allegedly involved in any assault on a civilian was sufficient to find disparate treatment for purposes of establishing race

discrimination. Defendant emphasizes that Plaintiff highlighted the disparate treatment instruction and alleged disparate treatment evidence to the jury during closing arguments as follows:

> For example, evidence that other employees engaged in conduct that was similar to plaintiff's conduct and were disciplined by similar decisionmakers as the plaintiff may support an inference of discrimination to the extent that a difference in treatment can reasonably be inferred. We talked about the Bickel and Bell incidents, two white officers at the Rally Burgers beating up a black individual, tearing his rotator cuff. And they didn't even do an investigation. We talked about - in fact, Bell was subject to promotion right now. We talked about the Eric Skabardis case, the white officer beating up a young black man by stomping him on the back of the head several times. He was investigated by the FBI. He was disciplined - well, the FBI said we're not going to have anything to do with this guy. But did the City of Saginaw do anything about it? No. In fact, according to Mr. McDole and his testimony, he is a member of the crime suppression team. He was never terminated, he's still there. . . . Well, what about Schirmer and Rocha on East Holland? Smashed a man's head open and were charged with brutality and were not disciplined. And what about the instruction that appears right below that? We know that at least under the disparate treatment instruction, we know that there is evidence that other employees engaged in conduct but were not treated similarly to plaintiff. They weren't terminated.

Tr. 127-28 (Mar. 3, 2009).

In response, Plaintiff contends that Defendant's proposed instruction would not have added any substance, but would have been redundant and confusing. Plaintiff contends that the additional language that Defendant sought to include contained such vague statements as "depends on the facts and circumstances of this case" and "generally speaking," which are meaningless, since the sweeping language left the jury to decide what made other individuals similarly situated to Plaintiff. Indeed, the Court would agree. Morever, the instruction by the Court, which required "similar" as opposed to the "same" decisionmakers and conduct is an accurate statement of the law, particularly given the fact that there were several alleged decisionmakers in this case. As the Sixth Circuit explained in *McMillan v. Castro*:

> . . . the requirement that a plaintiff and her comparator "must have dealt with the

-15-

same supervisor" to be considered similarly situated does not automatically apply in every employment discrimination case. Whether that criterion is relevant depends upon the facts and circumstances of each individual case.

405 F.3d 405, 414 (6th Cir. 2005). Based on the above, a new trial is not justified because the jury was properly instructed.

### D

Defendant contends that the following instruction should have been given:

If you find that the defendant honestly believed that the plaintiff committed the acts for which he was discharged, the defendant is not liable, even if defendant was mistaken, and you must find for the defendant. The discrimination statutes allow employers to discharge employees for almost any reason whatsoever (even a mistaken but honest belief) as long as the reason is not illegal discrimination. Thus, when an employee is discharged because of an employer's honest mistake, both state and federal antidiscrimination laws offer the employee no protection.

*See* [Dkt. # 62].

Defendant cites *Majewski v. Automatic Data Processing, Inc.*, for the following:

Under [the honest belief] rule, as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect. An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied on particularized facts that were before it at the time the decision was made.

274 F.3d 1106, 1117 (6th Cir. 2001) (internal quotations and citations omitted). The purpose of the rule is to keep the focus on the intent of the employer. *Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir. 1998). Defendant contends that, similarly, under Michigan law, it is not enough for a plaintiff to show that the defendant's decision was "wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent," quoting *Hazle v. Ford Motor Co.*, 686 N.W.2d 515 (Mich. 2001) (internal quotations omitted).

In this case, Defendant contends that there was a factual dispute and conflicting evidence on the question of whether Plaintiff actually committed some of the misconduct for which his employment was terminated. Specifically, there was conflicting evidence as to whether Plaintiff actually assaulted Alex Ornelas while handcuffed in the back of a police car. Thus, Defendant contends that the jury should have been instructed that even if Defendant was mistaken in its determination that Plaintiff assaulted Ornelas, such mistake was not evidence of race discrimination.

In response, Plaintiff emphasizes that the Court clearly informed the jury that race discrimination must be intentional:

> To prevail on his claims, the plaintiff must prove by a preponderance of the evidence that the defendant intentionally discriminated against him because of race. The discrimination must have been intentional. It cannot have occurred by accident. Intentional discrimination means one of the motives or reasons for the plaintiff's discharge was race.

Based on the above, a new trial is not justified because the jury was properly instructed.

III

Accordingly, it is **ORDERED** that Defendant's motion for new trial [Dkt. # 83] is **DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: November 24, 2009

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 24, 2009.

s/Tracy A. Jacobs
TRACY A. JACOBS